NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-773                                      Appeals Court

  VIRGINIA B. SMITH & others[1]  vs.  CITY OF WESTFIELD & others.[2]


No. 15-P-773.

Hampden.     April 14, 2016. - August 25, 2016.

Present:  Green, Trainor, & Milkey, JJ.


Municipal Corporations, Parks, Use of municipal property.  Parks
     and Parkways.  Constitutional Law, Taking of property.  Due
     Process of Law, Taking of property.


     Civil action commenced in the Superior Court Department on
April 27, 2012.

     The case was heard by Daniel A. Ford, J.


     Thomas A. Kenefick, III (Mary Patryn with him) for the
plaintiffs.
     Anthony I. Wilson (John T. Liebel with him) for the
defendants.

---

     [1] Thomas Smith, Daniel Smith, Ernie Simmons, Elizabeth
Simmons, Brian Winters, Erin Winters, Dean Winters, Virginia
Winters, Patricia Bettinger, Benjamin Larsen, Fred Pugliano, Don
Wielgus, Sharon Wielgus, Marcus Jaiclin, Karen Jaiclin, Frank
Mochak, Helen Mochak, William Wigham, Gary Wolfe, William
Schneelock, Fred Wrobleski, Jose Santos, Francis Simmitt, and
Barbara Simmitt.

     [2] City council and mayor of Westfield.

TRAINOR, J. The plaintiffs, Virginia B. Smith and other Westfield residents (collectively, residents), appeal from a judgment for the defendants, the city of Westfield and others (collectively, Westfield), which vacated a preliminary injunction that, in effect, prohibited a school construction project at the John A. Sullivan Memorial Playground (playground).[3] The residents challenge the judgment for two reasons. First, they argue that the playground was sufficiently dedicated to invoke the protection of art. 97 of the Amendments to the Massachusetts Constitution, notwithstanding the fact that no documents were ever recorded that dedicated the land for art. 97 purposes.[4] Second, the residents contend that the judge erred in concluding that a Statewide comprehensive outdoor recreation plan (SCORP) contradicts Mahajan v. Department of Envtl. Protection, 464 Mass. 604 (2013). We affirm, as we conclude that the playground has not been designated for an art. 97 purpose in a manner sufficient to invoke its protection.

Background. This matter came before a Superior Court judge on cross motions for judgment based on an agreed statement of facts. We summarize those facts, reserving some facts for later

---

[3] The playground is commonly referred to as the Cross Street playground.

[4] The residents therefore maintain that Westfield acted beyond its authority when it approved and permitted construction of a school building at the playground without obtaining a two-thirds vote of the General Court as required by art. 97.

discussion.  On November 13, 1939, Westfield took title to the land in question for the purpose of satisfying a tax debt pursuant to G. L. (Ter. Ed.) c. 60, §§ 53 and 54.  In 1957, Westfield passed an ordinance recognizing the land as a playground and naming it the John A. Sullivan Memorial Playground.  In 1979, the Federal Land and Water Conservation Fund (LWCF) awarded Westfield a grant that, in part, was used to upgrade the playground.  A SCORP was required for Westfield to be eligible for that grant.  See 16 U.S.C. § 460l-8(d) (1976).[5] The SCORP, which the residents assert applies to this matter, states:  "Land acquired or developed with [LWCF] funds become protected under . . . [art. 97]."  See Massachusetts Outdoors 2006:  Statewide Comprehensive Outdoor Recreation Plan, Executive Office of Energy and Environmental Affairs 4, http://www.mass.gov/eea/docs/eea/dcs/massoutdoor2006.pdf [https://perma.cc/T3D7-4EKN] (2006 SCORP).[6]  In 2010, Westfield endorsed an open space and recreation plan that designated the playground as "open space."  In August, 2011, the playground was determined to be surplus property, and the city council voted to

_____

[5] We cite to the Federal statute in effect in 1979, the year that Westfield applied for and was awarded the grant.  See, now, 54 U.S.C. § 200305(d) (Supp. II 2014).

[6] We question, as the judge did below, whether the 2006 SCORP is applicable when the grant was sought and awarded in 1979.  Nevertheless, we assume for purposes of this opinion only that the 2006 SCORP applies.

have it transferred to the school department in order to construct an elementary school.  In the hearing on the parties' cross motions, the residents conceded that no document was ever recorded in the registry of deeds designating the playground as land devoted to the "conservation, development and utilization of the agricultural, mineral, forest, water, air, and other natural resources."  Art. 97 of the Amendments to the Massachusetts Constitution.

Discussion.  1.  Article 97 protection.  The residents maintain that the playground is subject to art. 97 protection and that Westfield acted beyond its authority when it approved and permitted construction of a school building at the playground without obtaining a two-thirds vote of the General Court as required by art. 97.[7]  "The critical question to be

_____

[7] Article 97, which was approved and ratified on November 7, 1972, superseding art. 49, provides:

"The people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.

"The general court shall have the power to enact legislation necessary or expedient to protect such rights.

"In the furtherance of the foregoing powers, the general court shall have the power to provide for the taking, upon payment of just compensation therefor, or for

answered is not whether the use of the land incidentally serves purposes consistent with art. 97, or whether the land displays some attributes of art. 97 land, but whether the land was <u>taken for those purposes</u> [emphasis in original], or subsequent to the taking was <u>designated for those purposes</u> [emphasis supplied] in a manner sufficient to invoke the protection of art. 97." <u>Mahajan</u> v. <u>Department of Envtl. Protection</u>, 464 Mass. at 615. Article 97 protection also may arise where, following the taking for purposes other than art. 97, the land is specifically designated for art. 97 purposes by deed or other recorded restriction.  See <u>Selectmen of Hanson</u> v. <u>Lindsay</u>, 444 Mass. 502, 508-509 (2005).  See also <u>Toro</u> v. <u>Mayor of Revere</u>, 9 Mass. App. Ct. 871, 872 (1980) (applicability of art. 97 depended on whether the land had been conveyed "to the conservation commission . . . to maintain and preserve it for the use of the public for conservation purposes").  We agree with the motion judge's finding that Westfield did not specifically designate, in a manner sufficient to invoke the protection of art. 97,

---

the acquisition by purchase or otherwise, of lands and easements or such other interests therein as may be deemed necessary to accomplish these purposes.

"Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court."

i.e., by deed or other recorded restriction on the land, the playground for art. 97 purposes and that the playground was not taken for those purposes.  Westfield's subsequent actions of passing an ordinance naming the playground and endorsing the open space and recreation plan in 2010 are insufficient to subject the playground to art. 97 protection.  Compare Selectmen of Hanson v. Lindsay, supra at 508-509; Mahajan v. Department of Envtl. Protection, supra at 615-616.

2.  2006 SCORP.  The residents contend that because the 2006 SCORP considers land rehabilitated with LWCF grants as being under the protection of art. 97,[8] the judge erred in determining that the acceptance of the LWCF grant did not subject the property to art. 97 protection.  As the judge correctly stated, "[a] federal or state agency is not free to promulgate regulations which conflict with statutes passed by the state legislature or with the common law enunciated by the Supreme Judicial Court.  See Purity Supreme, Inc. v. Attorney Gen[.], 380 Mass. 762, 774-775 (1980)."  Moreover, the Supreme Judicial Court, as final arbiter of the Massachusetts Constitution, has interpreted art. 97 and defined its

---

[8] See Massachusetts Outdoors 2006:  Statewide Comprehensive Outdoor Recreation Plan, Executive Office of Energy and Environmental Affairs 4, http://www.mass.gov/eea/docs/eea/dcs/massoutdoor2006.pdf ("Land acquired or developed with [LWCF] funds become protected under the Massachusetts Constitution [Article 97]").

requirements. A Federal or State agency's regulations cannot conflict with the Supreme Judicial Court's interpretation of the Massachusetts Constitution. See Planned Parenthood League of Mass., Inc. v. Attorney Gen., 424 Mass. 586, 589-590 (1997). Accordingly, the 2006 SCORP cannot infringe upon the formalities for constitutional protection, as construed by the Supreme Judicial Court, by deeming the acceptance of an LWCF grant as creating art. 97 protection.

3. Prior public use doctrine. The residents argue that the prior public use doctrine requires the playground to be subject to art. 97 protection. We are not persuaded. "The prior public use doctrine holds that public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion." Mahajan v. Department of Envtl. Protection, 464 Mass. at 616 (quotation omitted). This doctrine is only applicable to land that is in fact devoted to public use. Id. at 617. Thus, as noted by Mahajan, in Muir v. Leominster, 2 Mass. App. Ct. 587, 588-589, 591 (1974), we "held the prior public use doctrine inapplicable to the sale for commercial purposes of a parcel of land, where that parcel had been conveyed to a city as a gift with no limitation on its use but was in fact used for thirty years as a playground and for other recreational purposes . . . [and] there had been neither prior

legislative authorization of a taking for a particular purpose nor a prior public or private grant restricted to a particular purpose." Ibid. (citation and quotation omitted). Accordingly, the prior public use doctrine, insomuch as it was adopted in the art. 97 context by the Supreme Judicial Court in Mahajan, does not subject the playground to art. 97 protection because that land had been conveyed to the city with no limitation on its use, and there was neither a taking for an art. 97 purpose nor a prior public or private grant restricting the land to an art. 97 purpose. See id. at 616-617.

Judgment affirmed.

MILKEY, J. (concurring).  I agree with the majority that we are constrained to affirm the judgment here based on Selectmen of Hanson v. Lindsay, 444 Mass. 502 (2005), and Mahajan v. Department of Envtl. Protection, 464 Mass. 604 (2013).  I write separately in the hope that the Supreme Judicial Court someday will revisit such precedent.

As this and legions of other cases illustrate, public officials charged with building schools, roads, and other important public facilities often seek to locate such facilities in existing parkland or similar land.[1]  See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 404 (1971) (interpreting the Federal statutes limiting the construction of highways through parkland).  In 1972, the people approved art. 97 of the Amendments to the Massachusetts Constitution as a means of protecting such lands from these development pressures.  See Mahajan, supra at 611-612.  The key language in art. 97 prohibits the sale or change in use of public parkland absent special legislative approval granted by a two-thirds roll call vote.  Id. at 612, quoting from art. 97 of the Amendments to the Massachusetts Constitution.  This prohibition applies to all

_____

[1] For many reasons, parkland presents an attractive development site to those whose mission is to build such facilities.  These include that the land is available at no apparent cost and without the need to displace any existing homes or businesses.

public land "taken or acquired" for the purposes that art. 97 was designed to protect. Ibid. Thus, where the land at issue originally was acquired by the public entity for such purposes, then art. 97 applies by its express terms (regardless of whether the reason for the acquisition happens to be noted on the deed).

What has been less clear until recently is the extent to which art. 97's protections also apply to land that originally was not expressly acquired for such specific purposes, but that subsequently was dedicated to them. As illustrated by the current case, as well as by Hanson and Mahajan, this is an extremely common scenario. Indeed, some of the Commonwealth's most venerable public parkland, such as Boston Common, was originally acquired for other purposes. See Lowell v. Boston, 322 Mass. 709, 716, 729-730 (1948) (land comprising "nearly all" of Boston Common was originally acquired by the town of Boston in 1633 for general purposes, but over time "it is plain that the town has dedicated the Common and the Public Garden to the use of the public as a public park").

As a matter of both logic and common sense, the bare fact that land has been put to an art. 97 use, without more, does not mean that the land was "taken or acquired" for such use. However, a different situation is presented once such land formally has been dedicated to an art. 97 use, especially where -- as is often the case -- management of the land has been

assigned to the State or municipal agency that has oversight of parkland or similar land.[2]  Under that scenario, the land readily can be said to have become "acquired" for art. 97 purposes, and therefore subject to art. 97 protections.[3]

Notably, the Supreme Judicial Court has rejected the narrow view that land can be subject to art. 97 only if it was originally acquired for that purpose.  Mahajan, supra at 615, citing Hanson, supra at 508-509 (art. 97 applies not only to

---

[2] In the case before us, Westfield accepted in 1946 the planning board's recommendation that the land at issue be used as a playground and transferred "full charge and control" of the land to the playground commission two years later.  In 1979, Westfield received State funding to improve this and other playgrounds.  Half of that funding was paid out of the Land and Water Conservation Fund (LWCF), a Federal program under which grant recipients are prohibited from changing the use of properties being funded (except in narrow circumstances not here applicable).  See 16 U.S.C. § 4601-8(f)(3) (1976).  Because this land received a LWCF grant, it long has been designated as "article 97 land" on the Massachusetts Statewide comprehensive outdoor recreation plan.  See, e.g., Massachusetts Outdoors 2006:  Statewide Comprehensive Outdoor Recreation Plan, Executive Office of Energy and Environmental Affairs 4, http://www.mass.gov/eea/docs/eea/dcs/massoutdoor2006.pdf [https://perma.cc/T3D7-4EKN] ("Land acquired or developed with [LWCF] funds become protected under . . . [art. 97]").

[3] This is consistent with the so-called "prior public use" doctrine from which art. 97 was derived.  See generally Mahajan, supra at 616 ("Because the spirit of art. 97 is derived from the related doctrine of 'prior public use,' cases applying that doctrine inform our analysis").  Under that doctrine, "public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion."  Robbins v. Department of Pub. Works, 355 Mass. 328, 330 (1969).  "In furtherance of the policy of the Commonwealth to keep parklands inviolate the rule has been stringently applied to legislation which would result in encroachment on them."  Ibid.

land originally taken or acquired for art. 97 purposes, but also to land that "subsequent to the taking [or acquisition] was designated for those purposes in a manner sufficient to invoke the protection of art. 97"). Nevertheless, the court severely has limited the circumstances under which land originally acquired for non-art. 97 purposes can become subject to art. 97's protections. Specifically, Hanson and Mahajan, taken together, appear to say that the only circumstance under which such land will be considered subject to art. 97 is where the restricted use has been recorded on the deed, e.g., through a conservation restriction. See Hanson, 444 Mass. at 506-509; Mahajan, 464 Mass. at 615-616. In my view, the particular line the Supreme Judicial Court has drawn with respect to art. 97's applicability is untenable as a matter of both theory and practice.

A close reading of Hanson reveals that the reason the court stated that record notice is a prerequisite to art. 97's application in this context is the perceived need to protect people who might innocently purchase the land without knowing that it was subject to art. 97.[4] As the court reasoned, "[t]o

---

[4] In Hanson, the land had been sold to a third party. The town alleged that the buyer -- whose agent was on the local conservation commission -- was aware of the town meeting vote designating the parcel as conservation land and therefore was not in fact a bona fide purchaser. However, the Supreme Judicial Court concluded that the town had waived the issue by

conclude that this [the dedication of the land for conservation purposes] could be accomplished solely by [a town meeting] vote, without recordation of any instrument, would eviscerate the purposes of our recording acts."  Hanson, supra at 509.

Nothing in the language or purpose of art. 97 suggests that its application should turn on whether the underlying deed provides record notice that the land has been committed to an art. 97 use.[5]  Recording statutes obviously serve laudable goals, but they cannot trump a constitutional provision.[6]  If art. 97 can apply to public land that formally has been dedicated to an art. 97 purpose even though that land originally was not acquired for such a purpose, it makes little sense to prevent its application based on the theoretical concern that a future

---

not adequately raising in its complaint a claim challenging the buyer's status as a bona fide purchaser.  Hanson, supra at 509-510.

[5] It bears noting that in subjecting land it already owns to a conservation restriction (the form of record notice on which the court focused in Hanson), a public entity would not be "acquiring" land at all, but instead would be granting a statutorily-recognized property interest to another.  See generally Parkinson v. Assessors of Medfield, 398 Mass. 112, 113-115 (1986) (explaining how conservation restrictions work).

[6] In other contexts, the court has not hesitated to rule that the rights of actual bona fide purchasers can be outweighed by other important interests.  See, e.g., Bevilacqua v. Rodriguez, 460 Mass. 762, 776-779 (2011) (discussing void transactions, from which a bona fide purchaser may not take good title).

purchaser might not be aware that it applies.[7] In fact, for the large subset of dedicated parkland that originally was acquired for non-art. 97 purposes, the rule established by Hanson and Mahajan threatens to reduce art. 97 to near irrelevancy: its protections would apply only where the public entity had already taken steps to ensure that those protections were not needed.[8]

It may be tempting to say that the rule established by Hanson and Mahajan is not problematic, because the public actors charged with protecting parkland have the power to initiate the additional recordation steps necessary to make such land subject to art. 97, e.g., by subjecting the land to a conservation restriction. In fact, the Supreme Judicial Court itself indicated that it was rejecting a broader reading of art. 97's application in part because of "the ability of a narrower interpretation to serve adequately the stated goals of art. 97."

---

[7] This is particularly true given that it is difficult to imagine that someone seeking to purchase or develop dedicated public parkland would not be aware of that use.

[8] Article 97's protections are procedural only; the land can be sold or put to a different use if the requisite legislative votes are obtained. In contrast, a conservation restriction provides permanent substantive protection for the land (unless the restriction were released by the Secretary of Energy and Environmental Affairs pursuant to the strict test enumerated in G. L. c. 184, § 32). I recognize that there is a suggestion in Mahajan that a conservation restriction as such may not be needed to trigger art. 97's application and that it may suffice for the public owner to go through the odd formality of deeding the land back to itself for art. 97 purposes. Mahajan, supra at 616.

Mahajan, supra at 615.[9]  But practical realities stand in the way of such optimistic thinking.  Where, from all appearances, public land has been dedicated permanently to parkland or other art. 97 uses, the relevant public officials charged with protecting such land face little galvanizing pressure to go through the effort and expense of taking the additional steps suggested by Hanson or Mahajan.  Indeed, because it often takes extensive research even to uncover the purpose for which existing parkland originally was "taken or acquired," the relevant actors may have no idea that the additional steps are necessary for art. 97 to apply.  Once the need to take such steps surfaces -- that is, after the perceived need to use the land for a pressing competing use has arisen -- it likely has become too late to implement such measures.

The overriding point of art. 97 is to insulate dedicated parkland from short-term political pressures.  I fear that the effect of Hanson and Mahajan is to rob art. 97 of its intended force with regard to a great deal of dedicated parkland across the Commonwealth.

---

[9] The court also alluded to "the practical consequences that would result from . . . an expansive application," without spelling out what specific problems it had in mind.  Mahajan, supra at 615.